# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| LACY KELLY, III, | : | |
| Plaintiff, | : | Case No. 3:08cv00271 |
| vs. | : | District Judge Thomas M. Rose |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.  INTRODUCTION

Various health problems led Plaintiff Lacy Kelly, III to apply for Disability Insurance Benefits (DIB) from the Social Security Administration. He asserted through his DIB application that he was eligible to receive DIB because his health problems prevented him from working, starting on December 15, 2003 and continuing thereafter.

The Social Security Administration denied Plaintiff's DIB application at each stage of administrative review including, most notably, through the written decision of Administration Law Judge (ALJ) Thaddeus J. Armstead, Sr. (Tr. 16-30). ALJ Armstead determined that Plaintiff was not under a "disability" as defined by the Social Security Act, and that as a result, he was not eligible to receive DIB. *Id*.

There is no dispute in the present case that this Court has jurisdiction to review the ALJ's decision. *See* 42 U.S.C. §405(g).

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

#9), the Commissioner's Memorandum in Opposition (Doc. #13), the administrative record, and the record as a whole.

Plaintiff seeks an Order remanding this case to the Social Security Administration for payment of benefits or, at a minimum, a remand for to correct certain errors.

The Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

### A. Plaintiff and His Hearing Testimony

Plaintiff was 50 years old on the date his claimed disability began. He is consequently considered a "person closely approaching advanced age" for purposes of resolving his DIB application. *See* 20 C.F.R. §404.1563(d); *see also* Tr. 29. He completed high school and earned Bachelor's degree in accounting. (Tr. 81, 415). From 1981 until December 2003 Plaintiff worked as an accountant or accounting manager. (Tr. 76). At the time of the ALJ's hearing, Plaintiff was working part-time as a payroll assistant. (Tr. 414-15, 417-18). Plaintiff served in the United States Air Force from 1971 to 1975 and was honorably discharged. (Tr. 416).

During the ALJ's hearing, Plaintiff testified he has diabetes and suffered a stroke in December 2003. (Tr. 417). His biggest medical problem that prevents him from working is diabetic neuropathy, which is "spreading throughout [his] body." (Tr. 418). And it has worsened since his stroke. He explained to the ALJ, "It effects both feet, I have no feeling, both hands, numbness, tingling." *Id*. Plaintiff has "very little feeling when walking, it's always a burning, stinging sensation in [his] feet, they swell." (Tr. 419). He wears a brace every day and diabetic shoes when walking. He noted that he loses his balance and has right-side weakness since the stroke; the brace prevents him "from walking into walls and grocery shelves and so on." *Id*. Pain and swelling from diabetic neuropathy leaves him barely able to walk 1 block. (Tr. 423).

Plaintiff uses an insulin pump to treat the diabetes, and he attends a diabetic clinic. (Tr. 419-20). He testified that he experienced "thalamic pain" – a "shooting pain down

the right side of [his] body." (Tr. 420). Since suffering the stroke, the right side of his face and body "still feels like it has Novacain," (Tr. 420) – presumably meaning numbness and/or tingling. Prescription pain medications do not typically work at all, but he has received about 20% relief from pain by taking Cymbalta. (Tr. 421). Plaintiff's focus is distracted by pain and by trying to block it out. *Id*.

Plaintiff sees a psychiatrist, Dr. Walters, for treatment of depression and anxiety. He explained, "since the stroke I'm more anxious all the time, I tend to stay stressed, confused. I don't multi-task or stay organized like I used to." (Tr. 422). When asked if depression and anxiety affects his ability to work, Plaitniff testified: "since the stroke I'm more anxious all that time, I tend to stay stressed, confused. I don't multi-task or stay organized like I used to." (Tr. 422). Plaintiff stated that since he started to work part-time, he was hospitalized three times for stress-related issues. (Tr. 422-23). When asked about his memory and concentration, Plaintiff stated in part, "I'm never sure about anything anymore. It just seems like I'm in a cloud of confusion, I'm second guessing myself, trying to remember if I took my meds.... And when in doubt I just don't take them because I can't remember if I did or not and that's why I went on the pump, because I would forget if I took a shot or didn't take a shot." (Tr. 423).

Plaintiff noted that after he was in a car accident, he discovered he had arthritis in his neck and shoulders. (Tr. 424). He testified, "so it's, there is a constant shooting pain all the time throughout my body and as a result my sugar levels tend to stay high and I have a hard time regulating them." *Id*.

Plaintiff described his daily activities as follows: "I use[d] to enjoy reading, playing racquetball, working out, those things I don't do anymore mainly because when I read I don't, I tend to just drift off, go in different directions and forget what I'm reading." (Tr. 424). Plaintiff noted that he is limited to standing only 30 minutes at a time before needing to sit. (Tr. 427).

    B.    **Additional Evidence**

3

In January 2003 Plaintiff saw a psychologist with the Veterans Administration. He reported "feeling anxious and depressed throughout his lifetime." (Tr. 290). Plaintiff informed the psychologist that he feels depressed "a great deal of the time, especially when he goes off medication." (Tr. 291). The psychologist noted diagnostic impressions of major depression, recurrent, and posttraumatic stress disorder. (Tr. 290-91). Upon referral to a psychiatrist, Paul Jeffrey Schwartz, M.D., Plaintiff again reported a long history of depression and was continued on Effexor (venafaxine) with the addition of Wellbutrin (bupropion). (Tr. 289).

Plaintiff was hospitalized and treating for an acute left thalmamic stroke in December 2003. His symptoms included paresthesias (numbness) and sensory deficits in his right upper arm. (Tr. 197). In addition to the stroke, a physician listed various diagnoses: diabetes, type 2 poorly controlled (Hemoglobin A1C of 10.3%); hypertriglyceridemia; nicotine dependence; status post back surgery; and depression. (Tr. 197). At that time, Plaintiff was taking nine medications including, for instance, insulin (Novolog, Lantis), Lipitor, and Wellbutrin. (Tr. 198). Plaintiff was discharged to home with advice to follow-up with his primary care physician. (Tr. 197).

Two months after the stroke, Plaintiff wrote a letter to Dr. Schwarz, who noted, "This pt., whom I have seen only once 1 year ago (and who NO SHOW'd for his follow-up visit), wrote me a letter. He states he had a left thalamic infarct, with resultant R sided numbness and weakness. He depression and anxiety are worse, and he reports confusion, memory lapses. He also states his 'PTSD' (from childhood memories) is worse...." (Tr. 279).

Plaintiff applied for DIB in February 2004.

In March 2004 Plaintiff saw Dr. Schwartz reporting increased in his intrusive thoughts about his abusive upbringing since the stroke. (Tr. 273). Plaintiff also reported poor memory and concentration, low-self esteem, and social withdrawal. *Id.* Dr. Schwartz increased Effexor and resumed Wellbutrin, and he referred Plaintiff to a

therapist. *Id*.

Plaintiff was evaluated in July 2004 by Michael T. Farrell, PhD, a psychologist for the Ohio Bureau of Disability. (Tr. 231-38). Dr. Farrell diagnosed Plaintiff with post-traumatic stress disorder, and major depressive disorder, recurrent and moderate. (Tr. 237). He assessed Plaintiff's then-current GAF at 50, indicating a person with "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34 (DSM-IV-TR).[2] When assessing Plaintiff's ability to perform mental work activities, Dr. Farrell opined that (1) he had no impairment to his ability to understand, remember, and follow simple instructions; (2) he had a moderate impairment to his ability to maintain attention, concentration, persistence, and patience to perform simple, repetitive tasks; (3) he had a mild impairment to his ability to interact effectively with coworkers, supervisors, and the general public; and (4) he had a moderate impairment to his ability to withstand the stress and pressure associated with daily work. (Tr. 238). Dr. Farrell also opined, in part, "He sees himself as totally disabled and may overestimate his mental disabilities as evidenced by his performance on intellectual testing. He remains significantly depressed and anxious despite receiving medical and psychological care." *Id*.

Plaintiff continued psychological and psychiatric care through 2004 and into 2005. In May 2005 Plaintiff began seeing psychiatrist Charles L. Walters, M.D. (Tr. 384). Dr. Walters completed forms in August 2006. (Tr. 392-402). Dr. Walters believed that Major Depressive Disorder and Post-Traumatic Stress Disorder caused Plaintiff to have poor or no ability to relate to coworkers, deal with the public, interact with supervisors,

---

[2] " GAF," Global Assessment Functioning, is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* DSM-IV-TR at pp. 32-34.

dealt with work stresses, or maintain attention/concentration. (Tr. 392-93). According to Dr. Walters, these mental health conditions also caused Plaintiff to have poor or no ability to understand, remember, and carry out complex or detailed job instructions; and to have only a fair ability to understand, remember, and carry out simple job instructions. (Tr. 393). Dr. Walters also believed that these mental health conditions deprived Plaintiff of the ability to demonstrate reliability, and caused him to have a fair ability to behave in an emotionally stable manner or to relate predictably in social situations. (Tr. 394). Dr. Walters also checked boxes on a form indicating that Plaintiff met the Listing-level criteria[3] for an affective disorder and anxiety disorder. (Tr. 398-99, 402).

## III. THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and

---

[3] The Regulations contain a list of highly debilitating health problems and related criteria. If a claimant satisfies the criteria for one or more of these health problems, the Commissioner presumes he or she suffers from a disability. *See* Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 14-15; *see also* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity,[4] can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

## IV. THE ALJ's DECISION

The ALJ conducted required five-step sequential evaluation. *See* Tr. 18-30. The most significant findings for purposes of the present case were several.

The ALJ found Plaintiff to have severe impairments of (1) insulin dependent

---

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

7

diabetes mellitus, poorly controlled; (2) high blood pressure; (3) left thalamic stroke, post; (4) major depressive disorder; (5) anxiety related disorder; and (6) post-traumatic stress disorder. (Tr. 19).

The ALJ assessed Plaintiff's Residual Functional Capacity as follows:

> [F]rom the date alleged disability onset date until January 14, 2005, the claimant had the residual functional capacity to perform the exertional requirements of light work ... subject to the following restrictions: (1) no more than simple repetitive tasks; (2) opportunity to alternate sit and stand at least 15 minutes per hour and no constant walking; (3) must avoid exposure to concentrated extremes of cold...; (4) only occasional work setting changes.... [S]ince January 15, 2005, through the date of this decision, the [claimant] had the residual functional capacity to perform the residual functional capacity to perform the exertional requirements of light work ... subject to the following restrictions and/or limitations: (1) opportunity to alternate sit and stand at least 15 minutes per hour and no constant walking; (2) must avoid exposure to concentrated extremes of cold...; (3) only occasional walking.

(Tr. 24). The ALJ concluded that Plaintiff was unable to perform his past relevant work from his claimed disability onset date of December 15, 2003 until he began working again – thus performing his past relevant work – on January 15, 2005. (Tr. 28).

The ALJ further determined that Plaitniff could perform a significant number of jobs existing in the national economy. (Tr. 29-30).

As a result of the ALJ's findings throughout the sequential evaluation, he concluded that Plaintiff was not under a disability and not eligible for DIB. (Tr. 16-25).

## V. JUDICIAL REVIEW

Judicial review determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of

"'more than a scintilla of evidence but less than a preponderance...'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). An ALJ's factual findings must be upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Once substantial supporting evidence is found in the administrative record, courts do not consider whether they agree or disagree with the ALJ's findings or whether the administrative record contains contrary evidence. *Rogers*, 486 F.3d at 241; *see Her*, 203 F.3d at 389-90.

Substantial evidence is not the analytical ending point. Judicial review further considers whether the ALJ "applied the correct legal criteria." *Bowen*, 478 F.3d at 746. If the ALJ does not, the decision may not be upheld even if the findings are supported by substantial evidence. *See id.* For example, a decision will not be upheld where the ALJ failed to apply mandatory procedural rules and standards established by the Commissioner's Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See id.* (and cases cited therein).

## VI. DISCUSSION

### A. The Parties' Contentions

Plaintiff contends that the ALJ erred by rejecting Dr. Walters' opinion because the ALJ believed – based on his own lay opinion, not a medical expert – that the level of impairment Dr. Walters identified would be indicative of a need for psychiatric hospitalization. Plaintiff also argues that it is not true, as the ALJ claimed, that there was no treatment notes by Dr. Walters. And, according to Plaintiff, the ALJ remaining reasons for rejecting Dr. Walters' opinions were inadequate and not supported by the

9

record.

The Commissioner argues that the ALJ properly relied on the opinions of Dr. Farrell, which the Commissioner explains were supported in part by the exam findings of Dr. Walters. The Commissioner further contends that Dr. Farrell's opinions and the ALJ's assessment of Plaintiff's Residual Functional Capacity were supported by the opinions of the state agency reviewers (Drs. Gaffey and Zwissler), and by Plaintiff's own testimony – for instance, Plaintiff's belief that diabetic neuropathy was his most serous problem. And the Commissioner offers many reasons why the ALJ did not err in rejecting Dr. Walters' opinions.

### B. Medical Source Opinions

The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a nonexamining medical advisor, or an examining physician who saw a claimant only once, or a medical advisor who testified before the ALJ. *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004); *see Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also* 20 C.F.R. §404.1527(d)(2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2).

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). However, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(d), (f); *see also* Ruling 96-6p at *2-*3.

### C.     Analysis

The Commissioner correctly notes as an initial matter that Plaintiff does not seek ongoing disability benefits. Plaintiff instead seeks DIB for the closed period of time from December 15, 2003 through January 14, 2005. *See* Tr. 411-12, 436. Plaintiff acknowledges in the administrative record that he returned to work in January 2005 and earned an amount of money above the amount necessary to show substantial gainful activity. *See* Tr. 411-12.

As a further initial matter, Plaintiff correctly points out that the ALJ relied on his own lay opinion, rather than relying on medical evidence, to support one reason for rejecting Dr. Walters' opinion. The ALJ believed that the degree of dysfunction Dr. Walters identified would require Plaintiff to undergo psychiatric hospitalization. *See* Tr. 26. This constituted error because the ALJ does not cite to a medical source opinion or any other medical evidence tending to support his belief that Plaintiff would need psychiatric hospitalization if he was as limited as Dr. Walters believed. *See* Tr. 26-27. Although it was error for the ALJ to rely solely on his own lay medical opinion, *see, e.g., Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000), this error is not fatal to the ALJ's

11

decision, because the ALJ provided numerous other reasons for not crediting Dr. Walters' opinions and because the ALJ's reasons were consistent with the Regulations, *see* §404.1527(d)(2)-(6), and supported by substantial evidence.

When assessing Dr. Walters' opinions, the ALJ set forth and applied the correct legal criteria. *See* Tr. 26; *see also* 20 C.F.R. §404.152(d)(2)-(5). The ALJ therefore did not err as a matter of law. *See Wilson*, 378 F.3d at 544.

The Regulations permitted the ALJ to consider whether Dr. Walters' opinions were unsupported. *See* 20 C.F.R. § 404.1527(d)(3). A review of the forms completed by Dr. Walters reveals that he only noted the diagnoses in support of the limitations he set; he did not provide any supporting explanation or he did not refer to any treatment notes and he provided no indication of what led to his opinions about Plaintiff's extreme work limitations. *See* Tr. 392-402. In addition, at least some of the information Dr. Walters documented during his mental status exam of Plaintiff revealed largely normal findings. For example, while Dr. Walters noted that Plaintiff had a dysphoric mood and anxious affect, Dr. Walters also noted normal speech, normal hygiene, normal thought processes, appropriate thought content, adequate cognitive functioning, good insight, good judgment and no hallucinations, delusions, or homicidal or suicidal ideas. (Tr. 358-59). These largely normal findings undermine the validity of Dr. Walters' opinion. *See* §404.1527(d)(3)("The more a medical source present relevant evidence to support an opinion, particularly medical signs..., the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion....").

The Commissioner, moreover, correctly observes that Dr. Walters' findings are also important because of the time line involved in this case. As previously discussed, *supra*, II(A), Plaintiff testified that his concentration and focus began around the time of his stroke (December 2003) and deteriorated over time. (Tr. 429). Yet Dr. Walters' February 2006 exam findings were the most recent mental status findings reported by a

health care provider.  The fact that Plaintiff still had largely normal cognitive functioning in February 2006, even though his concentration and focus deteriorated over time, reasonably suggests that Plaintiff's cognitive functioning was previously in the normal range during the relevant period of time from December 15, 2003 through January 14, 2005.

Dr. Walters' August 2006 opinion was also somewhat inconsistent with his GAF assessment in February 2006, just six months earlier, when Dr. Walters assigned Plaintiff a GAF score of 55, indicative of "moderate" limitations.[5]  And Dr. Walters altered his opinion in August 2005 – to find significantly greater limitations – even though neither he, nor any other health care provider, saw Plaintiff after February 2006.  Where a physician changes his opinion for the worse, and there is no corresponding deterioration in the claimant's condition, the ALJ may reasonably reject the changed opinion.  *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994).

Next Dr. Walters did not see Plaintiff during the period at issue (December 15, 2003 through January 14, 2005).  Dr. Walters first saw Plaintiff in May 2005, when he was, by his own concession, engaging in work sufficient to constitute substantial gainful activity.  *See* Tr. 72, 384.  An ALJ may reasonably reject a physician's opinion if the physician did not see the claimant during the relevant time period.  *See, e.g., Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).

Plaintiff argues that, in contrast to the ALJ's findings, Dr. Walters relied on the records of Dr. Schwartz and Dr. Papadakis.  The problem with this argument is that it overlooks the fact that Dr. Walters did not refer to those medical records in any manner.  *See* Tr. 392-402.  Moreover, the office notes from Drs. Schwartz and Papadakis did not support the limitations Dr. Walters identified.  Dr. Schwartz did not report any exam

---

[5] A GAF score of 55 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. no friends, conflicts with peers or co-workers)."  *DSM-IV-TR* at p. 34.

13

findings, *see* Tr. 266-67, 273, and Dr. Papadakis' exams revealed Plaintiff had good insight and judgment, and no hallucinations, delusions, or suicidal or homicidal ideas, *see* Tr. 269-70. Indeed, Plaintiff does not cite any findings from either Dr. Schwartz or Dr. Papadakis that supported Dr. Walters' August 2006 opinions.

Plaintiff also challenges the ALJ's statement that the objective evidence did not support Plaintiff's testimony that he could not focus for more than three hours a day. He contends that Dr. Farrell's report showed he could not concentrate or focus for more than three hours a day. This is inaccurate. Dr. Farrell reported that Plaintiff followed directions, gave well-organized answers, exhibited adequate attention, scored in the "high average" range for mathematical computation skills and immediate memory, and recalled numbers better than verbal material. (Tr. 234-36). Dr. Farrell also reported that Plaintiff had a verbal IQ of 111, a performance IQ of 81 and a full scale IQ of 98, in the average range of intellectual functioning. (Tr. 235). Moreover, Dr. Farrell opined that, despite moderately impaired attention and concentration, Plaintiff was able to understand, remember and follow simple instructions, and would have no difficulty following complex instructions. (Tr. 237-38). Dr. Farrell gave no indication that Plaintiff's abilities to understand, remember and follow simple instructions, and follow complex instructions, were limited to just three hours a day. *See id.* Any argument by Plaintiff to the contrary is not supported by these aspects of Dr. Farrell's report.

Plaintiff further argues that the ALJ failed to consider Dr. Farrell's opinion when he evaluated the opinion of Dr. Walters. However, the record shows that when discussing Dr. Walters' opinion, the ALJ discussed both Dr. Farrell's opinion and the opinions of the state agency reviewers. *See* Tr. 27. Plaintiff also argues that the ALJ failed to describe the weight he gave to Dr. Farrell's opinion. Yet, the ALJ explicitly stated that the restrictions contained in his assessment of Plaintiff's Residual Functional Capacity were "consistent with the report of psychological evaluation by Dr. Farrell." (Tr. 27). By citing and relying on the consistency between his Residual Functional Capacity finding

and Dr. Farrell's opinion, the ALJ placed significant weight on Dr. Farrell's opinion.

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1. The ALJ's decision and Commissioner's resulting non-disability finding be affirmed;

2. The case be terminated on the docket of this Court.


July 14, 2009

                   s/Sharon L. Ovington
                    Sharon L. Ovington
                United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).